# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1060 North Cleveland Avenue, Apartment E,<br>Winston- Salem, NC 27101 | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:22MJ 478 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the     Middle     District of     North Carolina     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance |
| 18 U.S.C. § 924(c) | Carry/brandish a firearm during that drug trafficking crime |

The application is based on these facts:

see attached affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ RUSSELL JOHNSON
_____
*Applicant's signature*

Russell Johnson, Special Agent
_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 12/07/22

Judge's signature

City and state: Greensboro, North Carolina

United States Magistrate Judge L. Patrick Auld
*Printed name and title*

# ATTACHMENT A

*Property to be searched*

The residence is located at 1060 North Cleveland Avenue, Apartment E, Winston-Salem, North Carolina 27101. The property to be searched is shown in photographs below:



# ATTACHMENT B

*Property to be seized*

1. Controlled substances;

2. Paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as Mannitol and Quinine), and kilogram wrappers;

3. Currency or currency equivalents;

4. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6. Records that identify other co-conspirators, including: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film);

and audiotape recordings of conversations, including those made over telephone answering machines;

7.      Documents or other records relating to state court proceedings involving other co-conspirators, including, charging documents and bail records;

8.      Identification documents;

9.      Records of travel including, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

10.     Indicia of occupancy, residency, rental, control, and/or ownership of the premises/vehicle, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

11.     Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof; and cellphones and related records and equipment;

12.     Any digital media including cell phones, digital cameras, computers, compact discs and flash drives that could contain videos, photographs and communications, and the contents therein;

13.     Firearms, ammunition, firearm parts, firearm receipts, firearms brochures or owner's manuals, records of sale or acquisition of firearms, firearms magazines, and holsters;

14.     Computers or storage media.

## ELECTRONICALLY STORED INFORMATION

The above-identified information and/or data may be stored in the form of magnetic or electronic coding on computer media, or on media capable of being read by a computer or with the aid of a computer related equipment. This media includes but is not limited to any magnetic or electronic storage device such as floppy diskettes, hard disks, backup tapes, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic notebooks, cellular telephones, Smartphones (e.g., iPhone), or mobile media players (e.g., iPods). In searching for data capable

of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.    If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c.    If the computer personnel determine it is not practical to perform an on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.    Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) any data that falls within the list of items to be seized set forth within.

e.    In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f.    If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time.

g. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

- Any computer equipment and storage devices capable of being used to commit or store evidence of the offenses listed above;

- Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

- Any magnetic, electric or optical storage device capable of storing data such as floppy disks, hard disk tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, USB flash memory devices, personal digital assistants, mobile telephones or answering machines;

- Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

- Any applications, utility programs, compliers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

- Any physical keys, encryption devices and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

- Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

h. During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb – and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the targets face with his or her eyes open to activate

the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

# AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Russell Johnson, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn do depose and state the following:

## AFFIANT'S BACKGROUND & INTRODUCTION

1.     I am an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2510(7).

2.     I am employed as a Special Agent by the United States Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since November of 2005. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator and the ATF National Academy, where I received training on firearms and narcotics investigations. During my time with ATF, I have been assigned as a Special Agent to the Oxford, MS Field Office/New Orleans Field Division, a Project Officer to the Undercover Branch/Special Operations Division, a Special Agent to the Dallas Group IV Field Office/Dallas Field Division, currently a Project Officer to the Undercover Branch/Special Operations Division. As a Special Agent, I am charged with the duties of investigating violations of the criminal laws of the United States, including investigating violations of 21 U.S.C.

Search Warrant Affidavit - Page 1 of 16

§ 841(a)(1) & (b)(1)(C): Possession of a Controlled Substance with Intent to Distribute.

3.    Currently, I am conducting an investigation into the firearm possession and drug distribution activities of Cleavon Antuane Sligh in the Middle District of North Carolina. As a result of this investigation, I have probable cause to believe that Sligh, did knowingly or intentionally, manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance, in violation of 21 U.S.C. § 841(a)(1), that he did carry/brandish a firearm during that drug trafficking crime, in violation of 18 U.S.C. § 924(c) and that he did use a telecommunication device, in violation of 21 U.S.C. § 843. Further, as a result of this investigation, I have probable cause to believe that there are items and information, named and more fully described in Attachment B, that constitute evidence and fruits relating to violations of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 924(c) and 21 U.S.C. § 843 concealed within:

    a.    A single-family residence/apartment located at 1060 North Cleveland Avenue, Apartment E, Winston-Salem, North Carolina 27101 (**Target Location** more fully described in Attachment A)

4.    As a law enforcement officer, I have used and/or participated in a variety of methods investigating firearm and drug related crimes, including, but not limited to, electronic and visual surveillance, witness interviews, the use of search warrants, the use of confidential informants, the use of pen

registers/trap and trace devices, mobile tracking devices, and the use of undercover agents. Based on my training, experience, and participation in this investigation and other investigations involving federal firearms and controlled substances violations, I know:

a.     That drug traffickers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection of these assets by government or other law enforcement agencies;

b.     That even though these assets are in other persons' names, the drug dealers continue to use these assets and exercise dominion and control over them;

c.     That narcotics traffickers must maintain on hand large amounts of cash in order to maintain and finance their on-going narcotics business. Narcotics traffickers often carry, use, and traffic in firearms in order to protect their narcotics and money;

d.     That illicit drug traffickers maintain books, records, receipts, notes, ledgers, computers and computer disks, airline tickets, money orders, cashier check receipts, automobile rental car records, photographs, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

e.     That illicit drug traffickers commonly "front" (provide on consignment) controlled substances to their customers; and that the aforementioned books, records, computers with hard drive and floppy discs, compact discs, receipts, notes, ledgers etc. are maintained where the illicit drug traffickers have ready access to them;

f.     That persons who traffic in controlled substances are not unlike any other individual in our society in that they maintain documents and records. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained, and subsequently forgotten. Hence, documents that one would normally think a prudent person would destroy because

Search Warrant Affidavit - Page 3 of 16

of the incriminating nature of the documents are kept. In fact, I have participated in the execution of search warrants where documentary evidence dating back years has been found. It is also my experience that the larger, more complex a continuing criminal enterprise is, the more documentary evidence is generated during the course of commission.

g.      That it is common for large-scale dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, businesses, safe deposit boxes, and obscure locations known only to them, i.e. mail drops, mini storage warehouses, etc., for ready access and to conceal them from law enforcement authorities;

h.      That persons involved in large-scale drug trafficking conceal in their residences, businesses, safe deposits boxes, obscure locations, and vehicles, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, personal effects, coin collections, and other items of value representing the proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal narcotic trafficking activities;

i.      That drug dealers often purchase expensive vehicles and residences with the proceeds from their drug transactions;

j.      That when drug dealers amass proceeds from the sale of drugs, they often attempt to legitimize these profits. I know that to accomplish this goal, drug traffickers utilize including, but not limited to, foreign and domestic banks and their attendant services, securities, credit cards, cashier's checks, money orders, bank drafts, letters of credit, brokerage houses, trusts, partnerships, shell corporations and business fronts;

k.      That drug traffickers and persons engaged in firearms offenses commonly maintain addresses or telephone numbers in cellular telephones, books, or papers which reflect the names, addresses and/or telephone numbers for their associates in the organization;

l.      That drug traffickers and persons engaged in firearms offenses take, or cause to be taken, photographs of themselves, their

associates, their properties, their products, and their firearms, and these persons maintain these photographs and videotapes;

m.      That in addition to methamphetamine, marihuana, cocaine, and other illegal and/or controlled substances, drug traffickers usually keep paraphernalia for manufacturing cutting, packaging, weighing and distributing their drugs.  This paraphernalia includes but is not limited to, scales, plastic bags, rubber gloves, heat sealers, and vacuum sealers; and

n.      That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, illegal trafficking in controlled substances.

o.      That the Net Worth and/or Source and Application of funds analysis can be used to show that a suspect's known expenditures and/or accumulation of assets substantially exceed his legitimate sources of income, which in turn may be used to prove that the suspect is engaged in illegal money generating activities, such as narcotics trafficking or fraud.  The Net Worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise, to his/her net worth at the approximate time of his/her arrest.  The Source and Application of funds analysis focuses on the suspect's expenditures during the period of the purported illegal activities and compares such expenditures with his legitimate sources of income.  Both analysis require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (one year).

p.      That other than assisting in the net worth/source and application of funds analysis, a financial profile of a suspect prior to the purported criminal activity evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity that are consistent with a person generating income from illegal activities (e.g., narcotics trafficking or fraud), as compared to a person earning income from legitimate sources.  Evidence of a defendant's expenditures, asset accumulation, financial life-style, net worth/source and application of

Search Warrant Affidavit - Page 5 of 16

funds analysis, and underlying financial documents necessary for such analysis are admissible evidence under federal case law in narcotic trafficking and money laundering cases. Thus, there is a need for such documents to be taken during the execution of a search warrant.

q. That the practice of receiving cash or other monetary instruments and holding this receipt to be a repayment of a prior loan and the wiring of money in nominee names through businesses such as Western Union or American Express MoneyGram, as opposed to utilizing the services available from mainstream financial institutions such as a bank, credit union, or savings and loan, are common tools utilized by narcotics traffickers;

r. That illegal possessors of firearms attempt to hide and conceal their true identity of the owner or possessor of the firearms. In attempting to do so, the prohibited person will sometimes use fictitious names when purchasing or sending firearms or use a relative, girlfriend or boyfriend, or associate to purchase, acquire, or send the firearm(s);

s. Most persons who own, possess, acquire or maintain firearms whether prohibited or not, keep and store firearms, ammunition, gun parts, gun-cleaning kits, holsters, ammunition belts, original box-packaging, targets, expended pieces of lead and bullet loading equipment either in their residence, storage building, or storage shed;

t. Firearms are seizable as indicia of drug dealing since possession of a firearm tends to demonstrate likelihood that the dealer took steps to prevent contraband, paraphernalia and proceeds from being stolen;

5. On the basis of the entire contents of this affidavit, I believe there is probable cause for the issuance of search/seizure warrants for the **Target Location** described herein in Attachments A, for the purpose of searching and the seizure of physical evidence relating to the above-referenced offenses, including contraband, outbuildings and assets used in or derived from the on-

Search Warrant Affidavit - Page 6 of 16

going criminal enterprise described in this affidavit, and the instrumentalities for the commission of the offense referenced herein *i.e.*, firearms, cellular telephone, telephone bills, toll records, telephone books (electronic and hand written), cellular phones, electronic storage devices, computers, photographs, correspondence, equipment and paraphernalia, for the dilution, weighing packaging, and otherwise engaging in the distribution of controlled substances and firearms possession.

6.    The statements contained in this affidavit are based in part upon my experience, knowledge of the facts and circumstances surrounding this investigation and on information provided to me by other law enforcement personnel and agencies.

7.    I have fully participated in the investigation of the offenses listed below.  As a result of my personal participation in this investigation, which includes, but is not limited to, the utilization of ATF and other law enforcement databases, use of confidential sources, interviews of cooperating defendants and witnesses, physical and electronic surveillance, and examination of reports submitted by other Special Agents and investigators, I am familiar with all aspects of this investigation.

8.    On the basis of this familiarity, I allege that the information in this affidavit shows there is probable cause to believe that Sligh, and other persons as yet unknown, have committed, are committing, and will continue violate 21

Search Warrant Affidavit - Page 7 of 16

U.S.C. § 841(a)(1) (Possession of a Controlled Substance with Intent to Distribute and Distribute), 18 U.S.C. § 924(c), and 21 U.S.C. § 843 (Use of a Telecommunication Device).

9.    I have not listed all the facts regarding the firearms possession and drug trafficking activities of the person named herein, but I have set forth facts that I believe sufficiently establish probable cause to support the issuance of a search warrant for the property listed within the body of this affidavit and in Attachment A (including any residence, outbuildings, and/or vehicles located upon its curtilage).  The facts to support a finding of probable cause are as follows:

## FACTS SUPPORTING PROBABLE CAUSE

10.    On October 8, 2022, an ATF Confidential Informant[1] (hereinafter "CI"), who I believe to be reliable and credible, provided information in regard to the illegal distribution of controlled substances and firearms possession by "VON," later identified as Cleavon Antuane Sligh, a convicted felon.  The CI stated Sligh informed him/her that he sells cocaine and marihuana and routinely carries a firearm.  Sligh provided his phone number as XXX-XXX-2686.  Utilizing a law enforcement database, Sligh was found to be associated

---

[1] The CI was compensated by ATF for his/her services and has a history of criminal convictions including at least one felony conviction.

Case 1:22-mj-00478-LPA   Document 1   Filed 12/07/22   Page 15 of 23

with the provided telephone number. The CI was shown the below state of North Carolina driver's license photograph of Sligh, who they positively identified as "VON." The address listed for Sligh on his State of North Carolina driver's license is the same as the **Target Location**.



Sligh DL Picture

11.     From on or about October 8, 2022, to on or about October 13, 2022, the CI and Sligh engaged in conversation, through text messages, regarding a future marihuana transaction.  Sligh sent the CI a video depicting marihuana he had for sale and Sligh utilized the aforementioned telephone number to communicate with the CI. The CI mentioned to Sligh that the CI has an associate that installs hidden compartments in vehicles and Sligh stated that he would be interested in discussing a hidden compartment further.

12.     On or about October 13, 2022, the CI arranged for Sligh to sell them two (2) ounces of marihuana for $400.  On this same date, an ATF Special

Agent acting in an undercover capacity (hereinafter UC), along with the CI, met with Sligh in the parking lot of McDonald's, located at 780 Martin Luther King Drive, Winston-Salem, North Carolina 27101, to conduct a transaction for two (2) ounces of marihuana.

13.     During this transaction, Sligh arrived driving a silver 2006 Pontiac sports utility vehicle, state of North Carolina license plate number RAV3159, registered to Elmeta Loretta Hickman (hereinafter "Hickman") at the **Target Location**. Hickman was identified as a passenger in the vehicle. Hickman's state of North Carolina driver's license has the **Target Location** as her address.

14.     Sligh entered the front passenger seat of the undercover vehicle (hereinafter, UCV). UC asked Sligh what he would want to conceal in a hidden compartment and Sligh replied, "my gun...my weed." Sligh retrieved two (2) clear plastic bags from his person that UC recognized by sight and smell as marihuana. Sligh informed UC that he had told the CI that cost would be $400, which UC then provided to Sligh to complete the transaction.

15.     UC asked Sligh about his ability to obtain firearms and Sligh showed UC a photograph on his cellular phone that depicted a 7.62 caliber pistol and Sligh stated that he had just purchased the firearm. Sligh returned to the hidden compartment conversation and stated he drives a cream-colored Chrysler 300 that has a "Big Von" sticker. Sligh told UC that he could also sell

Search Warrant Affidavit - Page 10 of 16

UC powder cocaine in the future. Sligh returned to his vehicle and the transaction was concluded.

16.   Following the transaction, the marihuana was weighed and determined to be approximately 57.65 grams. The transaction was audio/video recorded. The funds utilized to purchase the marihuana were prerecorded.



17.   On or about October 17, 2022, UC communicated directly with Sligh at the aforementioned phone number and arranged for them to meet to further discuss hidden compartments. Sligh instructed UC to come to Target Location by providing UC with **Target Location** during a recorded phone call. When UC arrived, UC called Sligh and informed him that UC was in front of **Target Location**. UC observed Sligh exit **Target Location** and walk to where the UCV was parked. Sligh showed UC his vehicle and reiterated that he wished to conceal firearms and narcotics in a hidden compartment.



18.     Sligh pulled what UC recognized to be a firearm from his person. UC recognized what appeared to be a Smith & Wesson logo on the grip of the firearm.  Sligh told UC the firearm was a 9mm.  Sligh also showed UC a photograph on his phone of the firearm.  UC asked Sligh if he had any firearms for sale, which he stated he did not; however, would have some for sale on the upcoming Friday.  Sligh informed UC that he had marihuana, "beans," and "X pills" in his residence for sale.  "Beans" and "X pills" are common street names for pills that contain MDMA and methamphetamine and are also referred to as ecstasy.  UC informed Sligh that he would like to purchase pills and Sligh agreed to sell 32 MDMA/Ecstasy pills for $6 apiece.

19.     Sligh invited UC inside **Target Location** to conduct the transaction.  Once inside, UC waited in the dining room/kitchen area and Sligh walked to the back of **Target Location** and return moments later carrying a clear plastic bag containing the pills.   UC exited **Target Location** and retrieved money and then returned inside **Target Location**.  Sligh was sitting

at the kitchen table counting out the pills. UC could see the previously brandished firearm protruding from Sligh's front right pant pocket. The handle and magazine were clearly visible. Sligh provided UC with the 32 MDMA/Ecstasy pills and in return, UC handed Sligh $200. The transaction was concluded, and UC departed **Target Location**.

20.     On or about this same date, the MDMA/Ecstasy pills were found to have a weight of 15.74 grams and a field-test was conducted which yielded positive results for methamphetamine. The transaction was audio/video recorded. The funds utilized were prerecorded. On November 29, 2022, your Affiant received a lab report from the Drug Enforcement Administration that showed the weight of pills to be 14.32 grams and that the pills tested positive for the presence of Methamphetamine (calc. as Hydrochloride). Photographs below depict the weight and results of field-test.

 

21.     On or about November 30, 2022, UC communicated directly with Sligh at the aforementioned phone numbere and arranged for Sligh to sell UC

50 MDMA/Ecstasy pills for $425. Sligh instructed UC to come to "1060 N Cleveland Ave" (**Target Location**) to complete the transaction. When UC arrived, he called Sligh and Sligh informed UC that he was not there and that "my lady going to give it to you." Moments later, UC observed the door to **Target Location** open and UC was invited into **Target Location** by Hickman. Hickman handed UC a clear plastic bag containing the suspected MDMA/Ecstasy pills and in return UC handed Hickman $440 to complete the transaction.



22. On or about this same date, the MDMA/Ecstasy pills were found to have a weight of 23.84 grams and a field-test was conducted which yielded positive results for methamphetamine. The transaction was audio/video recorded. The funds utilized were prerecorded.

 

Photographs above depict the weighing of the pills described above and the possible field-test.

23.    A review of a law enforcement database showed Sligh has been associated with **Target Location** as a resident from at least April 30, 2021 to present.    Hickman has observed to have been associated with **Target Location** from July 2012 to present as a resident.

## CONCLUSION

24.    Based on the preceding information, there is probable cause to believe that the named items and information more fully described in Attachment B, constituting evidence or fruits of violations of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 924(c) and 21 U.S.C. § 843 (Use of a Telecommunication

Device) will be found in the **Target Location** more fully described in Attachment A.

/S/ Russell Johnson, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Dated: December , 2022

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Honorable L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina